**CHRISTINA HUMPHREY LAW, P.C.**
Christina A. Humphrey (SBN 226326)
Robert N. Fisher (SBN 302919)
1117 State Street
Santa Barbara, CA 93101
Telephone: (805) 618-2924
Facsimile: (805) 618-2939
christina@chumphreylaw.com
rob@chumphreylaw.com

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley (SBN 174156)
Kiley L. Grombacher (SBN 245960)
31365 Oak Crest Dr., Suite 240
Westlake Village, CA 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON ZIMMERMAN, individually and as a representative of a Putative Class of Participants and Beneficiaries, on behalf of all similarly situated participants and beneficiaries on behalf of the CEDARS-SINAI HEALTH SYSTEM 403(B) RETIREMENT PLAN,<br><br>                    Plaintiff,<br><br>          v.<br><br>CEDARS-SINAI MEDICAL CENTER; THE CEDARS-SINAI BOARD OF DIRECTORS' PENSION INVESTMENT COMMITTEE, and DOES 1 through 10,<br><br>                    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT** |

# **TABLE OF CONTENTS**

INTRODUCTION ………………………………………...……….....……… 1

JURISDICTION AND VENUE…………………....…….…………………... 3

THE PARTIES……………………………………….....……………….....… 4

   Plaintiffs………….…………………………………….…..……………… 4

   Defendants…………….......……………………………….…………… 5

DEFENDANTS' FIDUCIARY OBLIGATIONS….…………….…...…………… 6

DEFINED CONTRIBUTION 401(K) PLANS AND IMPACT OF EXCESSIVE

FEES………………………………………………………….................. 7

THE ESTABLISHMENT OF THE TRUST AND THE DOCUMENTS RELIED

UPON FOR THE COMPLAINT'S ALLEGATIONS…………………………….. 9

FACTUAL ALLEGATIONS……………………………...……………………... 9

      A.   Defendants Paid VOYA and other Covered Service Providers

           Unreasonable Fees, Failed to Monitor their Covered Service

           Providers, and make Requests for Proposals from Other Covered

           Service Providers ……………………………...…………...…..…… 9

      B.   Defendants Caused the Plan Participants to Pay Excessive Fees and

           Lose Returns by Failing to Offer, Monitor, and Investigate Available

           Lower Cost Mutual Share Classes as Plan Investment Options …… 17

      C.   Defendants Imprudently Maintained the Plan's Investment in the

           VOYA Stable Value Fund, When Other Investment Vendors

           Offered Superior Alternatives.………………………….…… 26

           1.  VOYA's Excessive Spread Fees ……………………………… 28

           2.  Failure to Submit RFP's ………………………….………… 30

           3.  Defendants Failure to Diversify………………………………. 34

CLASS ACTION ALLEGATIONS……………..............………………… 35

FIRST CAUSE OF ACTION Breach of Fiduciary Duty of Prudence
(Against All Defendants)…………………………………………………... 36
SECOND CAUSE OF ACTION Breach of Fiduciary Duties in Violation of Duty to
Investigate and Monitor Investments and Covered Service Providers
(Against All Defendants)……..………………………..………………..……… 39
PRAYER FOR RELIEF……………………………………………....…..…... 40

CLASS ACTION COMPLAINT

Plaintiff Jason Zimmerman ("Plaintiff"), individually and as a representative of a Putative Class of Participants and Beneficiaries, on behalf of all similarly situated participants and beneficiaries on behalf of the CEDARS-SINAI HEALTH SYSTEM 403(B) RETIREMENT PLAN, (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA", 29 U.S.C. §§ 1001 *et seq.*, on behalf of the Plan against current Plan sponsor, CEDARS-SINAI MEDICAL CENTER ("CEDARS-SINAI"), THE CEDARS-SINAI BOARD OF DIRECTORS' PENSION INVESTMENT COMMITTEE and John Does 1-10 (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation and administration of the Plan.

## INTRODUCTION

1.      This action is brought by current and former employees / participants / beneficiaries of Defendants' Plan to recover losses due to mismanagement of the 403b retirement plan and certain selected funds. The 401k plan and the closely related 403b plan have become the dominant source of retirement savings for most Americans. Unlike defined-benefit pensions, which provide set payouts for life, plan participant accounts rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers. This action is filed to recover funds owed back to the plan on behalf of employees / participants / beneficiaries. These retirement funds are significant to the welfare of the class.

2.      Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. § 401 ("401(k) plans). Similar plans can also be offered by certain 501(c)(3) tax-exempt organizations, public schools, and other organizations under 26 U.S.C. § 403(b) ("403(b) plans"). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment. To

enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").

3.    The Defendants chose to accept the benefits of federal and state tax deferrals for their employees via a 403(b) plan, and the owners and executives of Defendant organizations have benefitted financially for years from the same tax benefits. However, Defendants have not followed ERISA's standard of care. This lawsuit is filed after careful consultation with experts and review of publicly available documents to return benefits taken from Plan participants by Defendants.

4.    The Plan at issue is a defined contribution retirement plan or a 403(b) plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. As of December 31, 2021, the Plan had 16,140 participants with account balances and over $2.15 billion in assets.

5.    ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1).  A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*. A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

6.    Specifically, Defendants breached their fiduciary duties of prudence and loyalty to the Plan by:

   a. Overpaying for Covered Service Providers by paying variable direct and indirect compensation fees through revenue sharing arrangements with the funds offered as investment options under the Plan, which exceeded costs

incurred by plans of similar size with similar services and which were in excess of and not tethered to the services provided;

b. Offering and maintaining funds with higher-cost share classes when identical lower cost class shares were available and could have been offered to participants resulting in participants/beneficiaries paying unnecessary costs for services that provided no value to them and resulted in a reduction of compounded return gains;

c. Retaining and Offering poorly performing funds within the Plan which failed to meet or exceed industry standard benchmarks including Morningstar category indices and best fit indices as determined by Morningstar.

d. Depriving participants of compounded returns through the excessive costs and investment in expensive underperforming funds;

 and

e. Failing to maintain and restore trust assets.

7.    Plaintiff was injured during the Relevant Time Period by the Defendants' flawed processes in breach of their fiduciary duties. As a result of Defendant's actions, participants invested in subpar investment vehicles and paid additional unnecessary operating expenses and fees with no value to the participants and resulting in a loss of compounded returns.

8.    Plaintiff, individually and as representative of a putative class consisting of the Plan's participants and beneficiaries, brings this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. In addition, Plaintiff seeks to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

9.    Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue

a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA § 502(e)(1), 29 U.S.C. §1132(e)(1).

11.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, many violations of ERISA took place in this District, and Defendants conduct business in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in and was employed in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## **THE PARTIES**

### *Plaintiff*

13.    Plaintiff Jason Zimmerman resides in Palm Springs, CA and was an employee of Cedars-Sinai and worked for Cedars-Sinai in this district. Zimmerman was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and is a participant in the Plan and upon information and belief invested in some or all of the funds which are at issue in this action.  As a direct and proximate result of breaches of fiduciary duties described herein, the Plan, the Participants, and members of the putative class suffered substantial losses and legal damages in the form of higher fees and lower returns on their investments than they would have otherwise experienced due to investment in the Plan and Plan wide-misconduct. Zimmerman was damaged by the Defendants' breaches of their fiduciary duties which impacted the Plan as a whole and damaged all Plan participants.

14.    Plaintiff Zimmerman has standing under 29 U.S.C. § 1132(a)(2) to bring this action on behalf of the Plan because Defendants' reckless and insouciant actions caused actual harm to an ERISA plan in which the Plaintiff participates. Plaintiff suffered an injury in fact by, *inter alia*, being forced to pay excessive fees to Fund service providers, investing in higher cost mutual fund shares when lower cost shares of the same fund were available to the Plan, and being deprived of a high quality and secure stable value investment option. Defendants are liable to the Plan for the Plan's losses under 29 U.S.C. § 1109(a).

***Defendants***

15.    Defendant CEDARS-SINAI MEDICAL CENTER ("Cedars-Sinai) is the current sponsor of the Plan and maintains its principal place of business at 8700 Beverly Blvd, Los Angeles, CA 90048. Cedars-Sinai is a registered nonprofit corporation with the State of California, and upon information and belief, operates as an administrator and/or fiduciary of the Plan.

16.    Defendant The Cedars-Sinai Board of Directors' Pension Investment Committee (the "Investment Committee") is composed of a group of fiduciaries of the plan tasked with administering and overseeing the Plan including selecting, monitoring and maintaining the best interests of the plan participants and beneficiaries.

17.    Defendant "Does" or the names of the individuals on the Board of Directors and related Committee(s), the Plan Administrator, as well as the Plan's manager, and Cedars-Sinai's officers during the Relevant Time Period are unknown at this time and are named as "John Does" until the "Does" are known and can be named through amendment to this Complaint.

18.    Cedars-Sinai, the Board of Directors, the Plan Investment Committee, the Plan's manager, the Plan Administrator, and the Directors and Officers are fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii) because they have sole authority to amend or terminate, in whole or part, the Plan or the trust, and have

discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

19.    Finally, although not named as a Defendants at this time, certain service providers are relevant parties to this Litigation.

20.    Based on Schedule C of the Form 5500s filed by the Plan, Cedars-Sinai contracted with VOYA Financial Partners ("VOYA Financial"), to serve as the Plan's Investment Advisor during the relevant time period.

21.    Based on Schedule C of the Form 5500s filed by the Plan, Cedars-Sinai contracted with VOYA Retirement Insurance & Annuity ("VOYA Retirement" and together with VOYA Financial, "VOYA"), to serve as the Plan's recordkeeper during the relevant time period.

22.    Cedars-Sinai had a concomitant fiduciary duty to monitor and supervise those appointees and contracted parties.

### DEFENDANTS' FIDUCIARY OBLIGATIONS

23.    ERISA and common law trusts imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. 29 U.S.C. §1104(a)(1)(A) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

24.    29 U.S.C. § 1104(a)(1)(B) and common law require a plan fiduciary to discharge his obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

25. A fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. at 1829.

26. 29 U.S.C. § 1106(a)(1)(C) and § 1108(b)(2) and the common law allow a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." VOYA is a "party in interest" under 29 U.S.C. § 1106(a)(1)(C).

27. 29 U.S.C. § 1132(a)(2) and common law authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

28. Section 1109(a) and common law provide "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." "One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." Restatement (Second) of Trusts § 205(c) (1959).

## DEFINED CONTRIBUTION PLANS
## AND THE IMPACT OF EXCESSIVE FEES

29. In a defined contribution plan, participants (and sometimes their employer) make contributions to plan participant's individual accounts. Participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus any investment gains less plan and investment expenses. *See* 29 U.S.C. § 1002(34). Plan Participants' investments are held in trust. Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor.

30.    Because retirement savings in defined contribution plans are intended to grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees and performance compound which can result in vast differences in the amount of savings available at retirement. As the Supreme Court explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. at 1825. In short, the damages caused by breaches of fiduciary duties to the Plan cause damages that continue to accrue and compound over time.

31.    In fact, the impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[1]

32.    As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively. Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time.

_____

[1] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/401kFeesEmployee.pdf

-8-

33.     Accordingly, courts have recognized that plan fiduciaries "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International*, 843 F.3d 1187, 1198 (9th Cir. 2016).

34.     The marketplace for retirement plan services is established and competitive. As of December 31, 2021, the Plan had 16,140 participants with account balances and over $2.15 billion in assets. As a result, the Plan has the tremendous bargaining power to demand low-cost administrative and investment management services and well-performing, low-cost investment funds.

## THE ESTABLISHMENT OF THE TRUST AND THE DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS

35.     Defendants' Annual Returns/Reports of Employee Benefit Plan to the U.S. Departments of Treasury and Labor ("Forms 5500" which are "Open to Public Inspection" and available for download from www.efast.dol.gov for forms filed in 2010 and onward).

36.     Plaintiff also requested Defendants Plan governing documents and but none were provided by Defendants.

37.     The underlying allegations in this Complaint are based on Plaintiff's documents, Defendants' past Forms 5500 filed with U.S. Departments of Treasury and Labor found at www.efast.dol.gov, mutual fund prospectuses found at https://www.sec.gov/edgar/searchedgar, as well as other publicly available information.

## FACTUAL ALLEGATIONS

**A.  Defendants Paid VOYA and other Covered Service Providers Unreasonable Fees, Failed to Monitor their Covered Service Providers, and make Requests for Proposals from Other Covered Service Providers**

38.     Defendants have a duty to prudently select covered service providers

("CSPs"). Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustee's fiduciary duty." 28 U.S.C. § 1108(b)(2) states that services must be necessary for the plan's operation. Department of Labor guidance has also emphasized the importance of prudently selecting service providers.[2] The DOL has observed that, when selecting a service provider, "the responsible plan fiduciary must engage in an objective process." *Id*. Such a process must be "designed to elicit information necessary to assess . . . the reasonableness of the fees charged in light of the services provided." *Id*.

39.   Recordkeeping is a necessary service for every defined contribution plan. Recordkeeping services for a qualified retirement plan, like the Plan, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

40.   The cost of recordkeeping and administrative services depends on the number of participants, not the amount of assets in the participant's account.

41.   The greatest cost incurred in incorporating a new retirement plan into a recordkeeper's system is upfront setup costs. After the Plan account is set up, individual accounts are opened by entering the participant's name, age, SSN, date of hire and marital status. The system also records the amount a participant wishes to contribute each pay period through automated payroll deductions. Participants can go on-line and change their contribution rate at any time.

42.   Because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

---

[2] DOL Info. Letter to Theodore Konshak (Dec. 1, 1997).

43.    Here, however, as of 2023, each Participant in the Plan pays an asset-based fee of 7.5 basis points (.075%) for recordkeeping and administrative services.

44.    This asset-based fee bears no relation to the actual cost of providing services or the number of plan participants and resulted in the payment of unreasonable recordkeeping fees.

45.    To put it another way, recordkeepers receiving an asset-based fee accrue significant ongoing pay increases simply as a result of participants putting money aside biweekly for retirement and the growth of participants' accounts.

46.    Thus, for example, in 2021, the Plan paid VOYA and other covered service providers approximately $1.7 Million even though VOYA and the other covered service providers had provided the same services for approximately $1.35 million the year before for approximately the same number of participants (16,140 vs. 15,975).

47.    Between 2017 and 2021, the number of plan participants with account balances increased 18%, but the recordkeeping and administrative fees more than doubled over the same time period (through the end of 2021).

| Recordkeeping & Administrative Fees | | | | | | 2017-2021 |
|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | % Increase |
| Participant Balances | 13,682 | 14,398 | 15,108 | 15,975 | 16,140 | 18% |
| Plan Assets | $1,305,416,037 | $1,285,124,978 | $1,580,660,523 | $1,837,405,201 | $2,140,448,410 | 64% |
| Recordkeeping & Admin Fees | $802,439 | $1,002,645 | $1,334,932 | $1,360,008 | $1,717,234 | 114% |
| Per Participant RK & Admin Fees* | $59 | $70 | $88 | $85 | $106 | 81% |

* Per participant fees were calculated by taking the "administrative fee" found on the Form 5500 filings under STATEMENT OF CHANGES IN NET ASSETS AVAILABLE FOR BENEFITS in the audit report and dividing by the number of participants with an end of year account balance under Part II, Section 6(g).

48.    Plaintiff calculated the administrative fee burdens based on the compensation levels shown on the Plan's Form 5500s filed with the Department of Labor.

49.    Based on these calculations, the Plan paid much more than a reasonable fee for VOYA's services, resulting in the Plan paying millions of dollars in excessive fees as shown in the tables below.

## PLAN YEAR 2021

| Plan Name | Participant Account Balances | ** Per Participant Fees | Plan Assets | Recordkeeper |
|---|---|---|---|---|
| ALLINA HEALTH SYSTEM 403(b) | 10,351 | $34 | $1,118,110,142 | Fidelity |
| THE UNIVERSITY OF CHICAGO 403(b) | 11,878 | $26 | $1,689,153,662 | TIAA |
| CARNEGIE MELLON UNIVERSITY 403(b) | 12,549 | $40 | $2,578,859,729 | TIAA |
| HOWARD HUGHES MEDICAL INSTITUTE 403(b) | 12,836 | $35 | $1,840,378,417 | TIAA |
| TEXAS CHILDRENS 403(b) | 15,788 | $37 | $1,706,483,926 | Fidelity |
| TRUSTEES OF BOSTON UNIVERSITY 403(b) | 15,961 | $42 | $2,919,785,483 | Fidelity |
| FROEDTERT HEALTH INC 403(b) | 15,969 | $70 | $1,599,122,679 | Lincoln |
| **CEDARS-SINAI HEALTH SYSTEMS 403(b)** | **16,140** | **$106** | **$2,166,631,940** | **VOYA** |
| VANDERBILT UNIVERSITY 403(b) | 16,270 | $47 | $2,453,627,290 | Fidelity |
| LEGACY HEALTH 403(b) | 17,185 | $27 | $1,634,638,164 | Lincoln |
| BARNABAS HEALTH INC 403(b) | 18,774 | $66 | $1,353,107,250 | Fidelity |
| ***Median** | 14,882 | $42 | $1,914,536,244 | |

*Median per participant fee excludes the Cedars-Sinai 403(b) Plan

** Per participant fees were calculated by taking the "administrative fee" found on the 2021 Form 5500 filing under STATEMENT OF CHANGES IN NET ASSETS AVAILABLE FOR BENEFITS in the audit report for each plan and dividing by the number of participants with an end of year account balance under Part II, Section 6(g).



-12-





** Year 2022 plan balance figures are duplicates of year 2021, since data is derived from the annual Form 5500 reports and the 2022 plan year Form 5500 has either not been completed or submitted to the Department of Labor or has not been made public yet by the Department of Labor.

50.    In fact, Cedars-Sinai also offers employees a different defined contribution plan with a similar number of participants (~16,000 as of Dec. 31, 2021). VOYA serves as the recordkeeper for that plan as well.  In 2021 the administrative costs for that plan were $41 per participant, proving that VOYA can provide recordkeeping services for at or under $42 per participant for a plan of this size.

51.    In addition to VOYA, there are numerous recordkeepers in the marketplace who are capable of providing a high level of service to the Plan, and who will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on service and price, and vigorously compete for business by offering the best service for the best price.

52.    The package of recordkeeping services the Plan received included standard recordkeeping services such as government reporting services, plan sponsor support services, recordkeeping services, and plan investment services and reporting.

53.    The Plan did not receive any unique services or at a level of quality that would warrant fees far greater than the competitive fees that would be offered by other providers as the Plan was charged by VOYA.

54.    Plaintiffs requested but were not provided with "service provider contracts" which would allow Plaintiffs to identify the precise services provided by VOYA.

55.    However, recordkeeping services are largely standardized because the recordkeepers must provide these services at scale to a large number of plans and must comply with regulatory requirements.  They cannot offer bespoke sets of services to each individual plan.

56.    The bulk of the fee paid for recordkeeping services pays for core recordkeeping services that do not vary from plan to plan.

57.    In this regard, for large plans like this Plan, recordkeeping services are offered in a bundle with standardized services including, but not limited to, recordkeeping, transaction processing, participant communications, plan document

-14-

services to ensure compliance with new legal and regulatory requirements, plan consulting services including regarding investment selection, accounting and audit services such as Form 5500 preparation, and compliance support and testing.

58.    Some other services may be added on an ad-hoc basis including, loan processing, brokerage services, distribution services, and processing of qualified domestic relations orders but the addition of such services would not have a dramatic impact on the cost of recordkeeping services.

59.    The market for defined contribution recordkeeping services is highly competitive, particularly for a Plan like the Cedars-Sinai Plan with large numbers of participants and a large amount of assets.

60.    The unreasonable fees paid to covered service providers through an asset-based fee arrangement directly resulted in part from the Defendants' choice of improper mutual fund share classes and failure to monitor the providers.

61.    Based on information provided by Defendants, the mutual funds paid annual revenue sharing fees based on a percentage of the total Plan assets invested in the fund, which were ultimately paid by Plan participants who invested in those funds.

62.    The Plan participants realized lower returns on their investments because they paid higher fund operating expenses.

63.    VOYA's fees so far exceeded reasonable recordkeeping fees to the point that no differentiation in services could explain the level of recordkeeping fees paid by the Plan.

64.    The clear explanation for this is that Defendants have a flawed and reckless provider selection process that is "tainted by failure of effort, competence, or loyalty." *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

65.    Defendants clearly failed to use the Plan's bargaining power to leverage its CSPs to charge lower administrative fees for the Plan participants.

66.    On information and belief, Defendants failed to bid the Plan out to other service providers during the Class Period.

CLASS ACTION COMPLAINT

67.    Defendants further failed to take any or adequate action to monitor, evaluate or reduce their service provider fees, such as:

a.  Choosing mutual fund share classes with lower revenue sharing for the Plan;

b.  monitoring costs to compare with the costs being charged for similar sized plans in the marketplace; or

c.  negotiating to cap the amount of revenue sharing or ensure that any excessive amounts were returned to the Plan.

68.    The amount of compensation paid to CSPs vastly exceeds any DOL and IRS prohibited transaction "reasonable compensation" exemption for "cost plus reasonable profit."

69.    In sum, the Plan unreasonably paid broker dealer intermediaries including VOYA fees far in excess of what the Plan needed to pay for their services and these fees were not tethered to the actual services rendered, but rather increased based on the amount of Plan funds which increased over time.

70.    ERISA holds fiduciaries "to a high standard of care and diligence" regarding fees: Fiduciaries must, among other things, "[e]stablish a prudent process for selecting investment options and service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor investment options and service providers once selected to make sure they continue to be appropriate choices." Additionally, The Department of Labor has consistently reminded ERISA fiduciaries of their responsivities to carefully evaluate fees when selecting plan investment options and then monitor fees on an ongoing basis. Defendants breached their fiduciary duties by failing to conduct themselves accordingly.

**B.    Defendants Caused the Plan Participants to Pay Excessive Fees and
Lose  Returns by Failing to Offer, Monitor, and Investigate Available
Lower Cost Mutual Share Classes as Plan Investment Options**

71.    An ERISA fiduciary's evaluation of plan investments must be focused solely on economic considerations that have a material effect on the risk and return of an investment based on appropriate investment horizons, consistent with the plan's funding policy and investment policy objectives. The corollary principle is that ERISA fiduciaries must never sacrifice investment returns, take on additional investment risk, or pay higher fees to promote non-pecuniary benefits or goals.

72.    A fiduciary may not subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives, and may not sacrifice investment return or take on additional investment risk to promote non-pecuniary benefits or goals such as to seek to burden participants/beneficiaries with fund expenses such as SEC Rule 12b-1 fees, subtransfer agency fees, shareholder servicing fees, commissions, finder's (incentive) fees or other types of fees just so their selected covered service providers are paid from participants/beneficiaries.

73.    The weight given to any pecuniary factor by a fiduciary should appropriately reflect a prudent assessment of its impact on risk-return. Revenue sharing always costs more (evidence follows) than the credit the Defendants are seeking to offset the receipt of an invoice by their chosen covered service providers.

74.    In the context of ERISA retirement plans such interests must be understood to refer to "financial" rather than "nonpecuniary" benefits, and Federal appellate courts have described ERISA's fiduciary duties as "the highest known to the law."

75.    Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

76.     Mutual funds often offer multiple "classes" of their shares to investors. Each class represents an identical interest in the mutual fund's portfolio. The principal difference between the classes is that the mutual fund will charge different operating expenses depending on the class.

77.     A mutual fund may charge an annual expense ratio of 1% of the gross assets of the fund to one share class, while charging a higher class share in that same fund an expense ratio of .50%. Thus, an investor who purchases the share class with a lower operating expense will realize a .50% greater annual return on his/her investment compared to an investor who purchases the share class with the higher operating expense. Generally, lower class shares are available to larger investors, such as 403(b) plans like the Plan.

78.     Plans that invest their participants' funds in lower share classes and subject them to higher fees engage in share class violations which are the most clear and obvious breaches of fiduciary duties in the Plan. *See Tibble v. Edison*, 2017 U.S. Dist. LEXIS 130806, *40 (C.D. Cal. Aug. 16, 2017) ("Because the institutional share classes are otherwise identical to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.").

79.     During the class period, Defendants have offered higher cost mutual fund share classes as investment options for the Plan even though at all times lower cost class shares of those exact same mutual funds were readily available to the Plan.

80.     Defendants selected the Plan's investment options. In this case, on information and belief, VOYA provided Defendants with a universe of pooled investment options from which to select a subset to offer Plaintiff and the other Plan participants.

81.     Defendants chose and continued to maintain a pool of investment options, including those that benefited VOYA at the expense of participants and beneficiaries of the Plan, including by offering higher cost share classes rather than readily available lower cost options.

-18-

82. Every fund invested in expensive share classes was imprudently selected and retained. In this regard, Defendants' selection and retention of expensive share classes reflected a lack of prudent processes because investing in expensive share classes causes return lags compared to investments in less expensive share classes and offers the Plan no pecuniary benefit and the Plan could easily have switched to the less expensive share classes but failed to do so.

### Cedars-Sinai Investment in High Expense Share Classes

| Fund | | 2019-2023 |
|---|---|---|
| Allspring Emerging Markets Equity Inst | Expense | 1.11% |
| Allspring Emerging Markets Equity CIT E | Expense | 0.95% |
| | Expense Difference | -0.16% |

| Fund | | 2019-2023 |
|---|---|---|
| Northern Funds Glbl Sustain Index Inst | Expense | 0.29% |
| Northern Funds Glbl Sustain Index Cl K | Expense | 0.24% |
| | Expense Difference | -0.05% |

| Fund | | 2017-2023 |
|---|---|---|
| AB Discovery Value Inst | Expense | 0.86% |
| AB Discovery Value Cl Z | Expense | 0.79% |
| | Expense Difference | -0.07% |

| Fund | | 2019-2023 |
|---|---|---|
| AllSpg Discovery SMID Cap Growth Inst | Expense | 0.88% |
| AllSpg Discovery SMID Cap Growth CIT E | Expense | 0.68% |
| | Expense Difference | -0.20% |

| Fund | | 2018-2023 |
|---|---|---|
| Blackrock Low Duration Bond Port Inst | Expense | 0.40% |
| Blackrock Low Duration Bond Port Cl K | Expense | 0.35% |
| | Expense Difference | -0.05% |

| Fund | | 2017-2022 |
|---|---|---|
| AB Global Bond Inst | Expense | 0.56% |
| AB Global Bond Cl Z | Expense | 0.51% |
| | Expense Difference | -0.05% |

83.    The use of expensive share classes was likely motivated by an improper desire to hide fees from Plan participants by using revenue sharing to pay some or all of the participants' fees instead of directly drawing them from the Plan or Defendants being billed directly for the fees.  But as demonstrated below, the fund invested in share classes that charged excess fees which created a drag on fund performance that was not justified by the desire to generate fees for revenue sharing.

84.    A prudent fiduciary would have recognized that the investment in an expensive share class was causing the Plan to pay excess fees and directly eroding the Plan's gains from these investments and would have switched to the cheaper share class.

85.    Other fiduciaries in similar circumstances have migrated Plan funds to cheaper share classes in recognition of the fact that investment in the more expensive share class is not in the pecuniary interest of the Plan.

86.    This holds true for all of the funds where Defendants selected a more expensive share class.

87.    Rather than benefiting the Plan, the use of expensive share classes benefits the investment advisor at the expense of the Plan because it generates excess fees which are only partially rebated over a period of time to the Plan and may also generate additional kickbacks to the investment advisor.

88.    The following chart illustrates the differences in the returns between the share classes chosen by Defendants and the least expensive share class and demonstrates that the investment in expensive fee share classes created a drag on fund performance.

89.    The fund name listed in the first row and shaded light blue represents the share class chosen by Defendants. The second fund name listed and shaded in darker blue represents the cheaper share class Defendants should have chosen which was available to them throughout the duration of the Class Period. The next line represents the return difference.  The bottom line show the difference in returns to the Plan based

on the selection of the higher-fee share class.  The final column shows the return difference from 2017 through the end of 2022.

**COST OF EXPENSIVE SHARE CLASSS FOR FUNDS IN PLAN**

| Fund | | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | |
|---|---|---|---|---|---|---|---|---|
| Allspring Emerging Markets Equity Inst | Annual Returns | -19.47% | -11.86% | 21.30% | 28.04% | NA | NA | |
| Allspring Emerging Markets Equity CIT E * | Annual Returns | -19.89% | -11.53% | 25.53% | 28.19% | NA | NA | |
| | Return Difference | 0.42% | -0.33% | -4.23% | -0.15% | NA | NA | |
| | Begin of Yr Balance | $7,804,358 | $8,031,934 | $5,843,150 | $8,528,459 | NA | NA | **2017-2022 Difference** |
| **Return Difference To Plan** | | **$32,778** | **($26,505)** | **($247,165)** | **($12,793)** | **$0** | **$0** | **($253,685)** |

| Fund | | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | |
|---|---|---|---|---|---|---|---|---|
| Northern Funds Glbl Sustain Index Inst | Annual Returns | -19.42% | 24.63% | 15.48% | 28.28% | NA | NA | |
| Northern Funds Glbl Sustain Index Cl K | Annual Returns | -19.37% | 24.71% | 15.50% | 28.28% | NA | NA | |
| | Return Difference | -0.05% | -0.08% | -0.02% | 0.00% | NA | NA | |
| | Begin of Yr Balance | $3,326,141 | $1,438,721 | $604,665 | $131,813 | NA | NA | **2017-2022 Difference** |
| **Return Difference To Plan** | | **($1,663)** | **($1,151)** | **($121)** | **$0** | **$0** | **$0** | **($2,935)** |

| Fund | | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | |
|---|---|---|---|---|---|---|---|---|
| AB Discovery Value Inst | Annual Returns | -16.17% | 35.72% | 3.35% | 20.11% | -15.05% | 13.00% | |
| AB Discovery Value Cl Z | Annual Returns | -16.13% | 35.84% | 3.45% | 20.17% | -14.98% | 13.08% | |
| | Return Difference | -0.04% | -0.12% | -0.10% | -0.06% | -0.07% | -0.08% | |
| | Begin of Yr Balance | $48,553,811 | $34,894,706 | $37,277,906 | $32,085,592 | $40,633,685 | $36,772,241 | **2017-2022 Difference** |
| **Return Difference To Plan** | | **($19,422)** | **($41,874)** | **($37,278)** | **($19,251)** | **($28,444)** | **($29,418)** | **($175,686)** |

-21-

CLASS ACTION COMPLAINT

| Fund | | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | |
|---|---|---|---|---|---|---|---|---|
| AllSpg Discovery SMID Cap Growth Inst | Annual Returns | -37.70% | -4.74% | 62.35% | 39.60% | NA | NA | |
| AllSpg Discovery SMID Cap Growth CIT E * | Annual Returns | -37.53% | -4.81% | 62.31% | 39.78% | NA | NA | |
| | Return Difference | -0.17% | 0.07% | 0.04% | -0.18% | NA | NA | |
| | Begin of Yr Balance | $27,414,660 | $28,687,596 | $14,855,819 | $8,528,459 | NA | NA | **2017-2022 Difference** |
| **Return Difference To Plan** | | **($46,605)** | **$20,081** | **$5,942** | **($15,351)** | **$0** | **$0** | **($35,933)** |

| Fund | | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | |
|---|---|---|---|---|---|---|---|---|
| Blackrock Low Duration Bond Port Inst | Annual Returns | -4.72% | -0.25% | 3.46% | 4.73% | NA | NA | |
| Blackrock Low Duration Bond Port Cl K | Annual Returns | -4.68% | -0.20% | 3.52% | 4.79% | NA | NA | |
| | Return Difference | -0.04% | -0.05% | -0.06% | -0.06% | NA | NA | |
| | Begin of Yr Balance | $4,002,998 | $4,716,144 | $1,400,457 | $58,664 | $0 | $0 | **2017-2022 Difference** |
| **Return Difference To Plan** | | **($1,601)** | **($2,358)** | **($840)** | **($35)** | **$0** | **$0** | **($4,835)** |

| Fund | | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | |
|---|---|---|---|---|---|---|---|---|
| AB Global Bond Inst | Annual Returns | -11.93% | -0.77% | 5.05% | 7.59% | 0.31% | 3.13% | |
| AB Global Bond Cl Z | Annual Returns | -11.99% | -0.60% | 5.10% | 7.64% | 0.36% | 3.18% | |
| | Return Difference | 0.06% | -0.17% | -0.05% | -0.05% | -0.05% | -0.05% | |
| | Begin of Yr Balance | $12,572,343 | $11,188,817 | $8,878,469 | $6,462,302 | $5,940,382 | $4,322,768 | **2017-2022 Difference** |
| **Return Difference To Plan** | | **$7,543** | **($19,021)** | **($4,439)** | **($3,231)** | **($2,970)** | **($2,161)** | **($24,280)** |

| | | |
|---|---|---|
| **TOTAL MISSED EARNINGS** | **2017-2022 Difference** |
| | **($497,353)** |

Color Legend
**Fund share class in plan**
**Lower fund share class available**

CLASS ACTION COMPLAINT

90. Defendants may seek to explain that they offered higher cost share classes with higher fee burdens by pointing to the Plan's ability to use those fees for revenue sharing arrangements. But this does not justify the increased fees and lost returns imposed on Plan participants. Rather, empirically speaking, revenue sharing burdens on mutual fund investors are *always* more costly than the revenue sharing credit offered by the corresponding mutual fund share class.

91. Investing Plan assets in higher cost share classes does not benefit plan participants because it causes them to pay excess fees which are not tied to any service provided to Plan participants.

92. The use of share classes to create funds for revenue sharing does not justify the increased fees and lost returns imposed on Plan participants. Rather, empirically speaking, revenue sharing burdens on mutual fund investors are always more costly over time than the revenue sharing credit offered by the corresponding mutual fund share class.

93. Even if some of the excess fees are rebated to the Plan, because rebates are only made after a set period of time, the Plan effectively lends out the rebated funds until such time as the rebate comes through, rather than keeping them in the Trust and accruing gains during that time.

94. Moreover, plan participants are generally not aware of the fee burden that their 401k/403b accounts bear from indirect fees. Unlike direct fees, which are clearly listed on participants' statements, indirect fees are unshown and unknown to those paying those costs. Here, the indirect fees may have appeared as a credit against administrative fees although the indirect fees were also paid by the participant, further confusing participants.

95. Indeed, because not all funds generate fees for revenue sharing, only those participants invested in the revenue sharing funds pay for the revenue sharing and the other participants get a free ride – which is impermissible discrimination against participants.

-23-

96.    Likewise, the rebate formula used may not equitably return funds to participants if participants make withdrawals or transfer out of the fund prior to the credit being posted.

97.    Because the Plan could have invested in the same mutual funds with a lower cost share class, the Defendants' actions were directly erosive to the trust's growth.

98.    Defendants thus caused Plan participants/beneficiaries harm by not just forcing them to pay higher fees, but also caused lost yield and returns as a result of those higher fees on many of the mutual funds offered through the Plan. The erosive effect of excessive fees and the resulting lost returns compounds over time substantially lowering the corpus of participants' retirement investments.

99.    In selecting share classes with higher fees, Defendants demonstrated a lack of basic skill and prudence when selecting investments.

100.    Not only did the Defendants fail to use the Plan's bargaining power to leverage lower cost mutual fund options for the Plan participants, they did not need to as the fund assets qualified them to meet any minimum initial investment requirements.

101.    Lastly, the information available for Defendants to make an informed assessment as to costs and returns available for each share class and to make the assessments noted above was made available in each fund's annual prospectus at the time the choices were made and Defendants also could and should have had processes in place to monitor the share classes of the Plan's investments but failed to put in place such processes.

102.    The Defendants' actions to choose high-cost funds demonstrates a lack of prudence. For example, the Allspring Discovery SMID Cap Gwrowth expensive share class had fees of eighty-eight basis points (0.88%/yr) as opposed to the share class with lower fees of six-eight basis points (0.68%/yr). The total excess fees paid

for the share class with higher fees was therefore twenty basis points per year (0.20%/yr).

103.   In other words, Defendants caused Plan participants who invested in that fund to pay .2% more in fees than necessary.

104.   Additionally, an analysis of each attribute of the different share classes reveals that there is no difference between the share classes other than costs and performance returns as a consequence of costs, all borne by the participants.

105.   Wasting the trust's money (i.e., participants/beneficiaries' money) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1) above. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs."   Uniform Prudent Investor Act (the "UPIA") §7.

106.   As is evident from the allegations in the Complaint, Defendants did not systemically and regularly review or institute other processes in place to fulfill their continuing obligation to monitor Plan investments and reduce Plan costs, or, in the alternative, failed to follow the processes, as evidenced by the offering of higher cost share classes as Plan investment options when lower cost options of the same funds were available.

107.   A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.   The total amount of excess mutual fund expenses paid by Plan participants over the past six years, which correspondingly reduced the return on the Plan participants' investments, resulted in millions of dollars of damages to participants.

**C.    Defendants Imprudently Maintained the Plan's Investment in the VOYA Stable Value Fund, When Other Investment Vendors Offered Superior Alternatives**

108.    The VOYA Stable Value Option (or "SVF")) is a type of stable value fund.

109.    Stable value products, including guaranteed investment contracts, are not required to be registered with the SEC. Single Company fixed annuity contracts are structured as an insurance company general account, or an insurance company separate account, and are solely regulated by the State Insurance Commissioner selected by the insurance company. There are also synthetic based stable value funds, which are run by a Registered Investment Advisor (RIA) regulated by the SEC.  The differences between the different types of funds are critical from a fiduciary standpoint.  The VOYA SVF was an insurance company separate account product.

110.    A stable value account in a retirement plan is (i) similar to a money market fund in that it provides principal protection, and (ii) similar to a bond fund in that it provides higher consistent returns over time. Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short – to intermediate – term bond fund.  The stability of assets enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by ensuring the fund transacts at book value.  Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund that results from fluctuations in interest rates associated with bond funds. [3] Single fixed annuity contracts are set by the insurance

---

[3] *See* Stable Value Fund v. Money Market Fund, Financial Web describing difference between stable value funds and money market funds), available at:
http://www.finweb.com/investing/stable-value-fund-vs-money-marketfund/html#axzz44EaLfQnQ.

company at their discretion which typically maximizes profit to the insurance company and minimizes returns to participants which is a fiduciary breach.

111.   There are several different types of stable value accounts in the 401(k) / 403(b) marketplace. Large plans often offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers"[4] and the fund owns the assets of the underlying funds. Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier, because there is only one "wrap" provider. As a result, they offer higher crediting rates. General account products, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently offer the highest rates.

112.   While the majority of plans the size of Defendants use a lower risk synthetic stable value product, there are still some Separate Account and General Account products.

113.   The VOYA SVF is a separate account product established pursuant to a contract between Defendants and VOYA. The investment funds are deposited by VOYA in a VOYA account, which enables VOYA to earn a "spread" representing by the difference between the crediting rate and the returns earned by VOYA from those account funds.

114.   The VOYA SVF also was subject to the single entity credit risk of VOYA, the issuer of the contract.

115.   The crediting rate, set in advance by VOYA and reset from time to time in VOYA's sole discretion, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest.  Thus, Defendants had the

---

[4] Stable value funds invest in fixed-income securities and wrap contracts offered by banks and insurance companies. Wrap contracts guarantee a certain return even if the underlying investments decline in value. To support that guarantee, a wrap contract relies on both the value of the associated assets and the financial backing of the wrap issuer.

opportunity and duty to evaluate the investment in advance; this is not a case of judging an investment with the benefit of hindsight.

116.    As an ERISA fiduciary, Defendants had an obligation to monitor the fees and performance of the VOYA SVF and to remove or replace it where a substantially identical investment option can be obtained from the same provider at a lower cost. *See, e.g.*, *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical -- other than their lower cost -- to products the trustee has already selected.").

### 1.    *VOYA's Excessive Spread Fees*

117.    Defendants did not have a viable methodology for monitoring the costs or performance of the VOYA SVF. Not only were comparable products available from other providers with higher crediting rates, but identical or substantially identical products were available to Defendants from VOYA and other stable value providers with higher crediting rates and lower spread fees. Although not all information is publicly available for comparison purposes,[5] limited documentation for the beginning of 2023 showed a 1.91% crediting rate paid by VOYA to Plan participants.  Other publicly available documents show a 10-year crediting rate of 1.99% and a 5-year crediting rate of only 1.56%.  For 2022, VOYA paid a crediting rate of 3% to the State of Nevada deferred compensation plan, which information is publicly available on VOYA's website.

---

[5] In September 2010 the trade group for State Government 401(k) plans, the National Association of Government Defined Contribution Administrators, (NAGDCA), created a brochure with the following characterization of insurance company general account stable value funds. "Due to the fact that the plan sponsor does not own the underlying investments, the portfolio holdings, performance, risk, and management fees are generally not disclosed. This limits the ability of plan sponsors to compare returns with other SVFs [stable-value funds]. It also makes it nearly impossible for plan sponsors to know the fees (which can be increased without disclosure) paid by participants in these funds—a critical component of a fiduciary's responsibility."

118.   The 1.91% crediting rate paid to the Plan participants by VOYA was far lower than the crediting rates paid to plans by other stable value funds during that time period.

119.   Higher spread fees result in lower crediting rates. This difference, more than 1% per year, is the excess spread that Defendants failed to monitor and rectify. Taking inflation into account, the difference in real dollar terms was even more pronounced, with real (net of inflation) returns for the Defendants' fund near zero.

120.   Defendants did not have to scour the marketplace to find a better performing fund, it simply had to make an effort, which it failed to make, to determine whether the same fund was available at a lower cost.  Fact sheets showing the available rates of market rate of VOYA funds and similar products from other providers were readily available had Defendants exercised even a minimal amount of due diligence.

121.   This breach of fiduciary duty alone resulted in a loss (before compounding) in excess of $50 million of participants' retirement savings. This loss is something a competent, prudent, and diligent fiduciary would have known was happening in advance and would have been able to avoid. There is a crucial distinction in evaluating a stable value product's returns against investment returns available elsewhere, from the standpoint of how a fiduciary's choice is to be evaluated. The product's performance over the life of the product is guaranteed for a period at the outset. The plan fiduciary knows prior to the date the product is selected what the returns will be six months in advance.

122.   The plan fiduciary also knows that, because of the manner in which crediting rates are calculated, the product is less sensitive to interest rates than bond funds. Consequently, a stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, such as Defendants' product, generally continues to perform poorly, in a stable manner.

123.   A prudent fiduciary – that is, a fiduciary that monitors the investment,

understands the pricing mechanism and informs itself of the crediting rates and spread fees available in the market – would have known that VOYA's stable value product would underperform and that being a stable value product it would continue to underperform in a stable manner.

124.    Defendants could have done substantially better for participants with other substantially identical risky insurance separate account products.  In addition, as set forth in more detail below, there are substantially similar risky insurance separate account products such as some from Mass Mutual and TIAA with over double the return.

### 2.    Failure to Submit RFP's

125.    A plan with a nearly $400 million stable value fund has considerable bargaining power in the marketplace. There are any number of stable value products available to plans with a $400 million stable value fund that are simply not available to plans with funds of a smaller size.

126.    To take advantage of this bargaining power, Defendants should have also submitted requests for proposal to other stable value fund providers. Products from any number of providers were available with better products, lower fees, and higher crediting rates.  For example, at the end of 2022, TIAA-CREF Retirement Choice paid 6.50%, over 3 times higher than VOYA's 1.91% crediting rate, for a similar product.

127.    The tables below show the losses incurred by the Plan's failure to obtain a better crediting rate from VOYA or submit bids and switch to a stable value option with a higher crediting rate available from other providers.

### VOYA Cedars-Sinai SVF Returns Net of Spread v. VOYA Nevada Stable Value Product

| Period Start | Voya Cedar-Sinai Net Crediting Rate | VOYA Nevada Crediting Rate | Excess Spread Fees (%) | SVF Assets ($) | Total Spread Fees by Period ($) |
|---|---|---|---|---|---|
| Jun-17 | 1.91% | 3.00% | 1.09% | 370,504,867 | 1,009,626 |
| Sep-17 | 1.91% | 3.00% | 1.09% | 373,651,937 | 1,018,202 |
| Dec-17 | 1.91% | 3.00% | 1.09% | 375,901,091 | 1,024,330 |
| Mar-18 | 1.91% | 3.00% | 1.09% | 379,497,118 | 1,034,130 |
| Jun-18 | 1.91% | 3.00% | 1.09% | 383,093,146 | 1,043,929 |
| Sep-18 | 1.91% | 3.00% | 1.09% | 386,689,173 | 1,053,728 |
| Dec-18 | 1.91% | 3.00% | 1.09% | 390,285,200 | 1,063,527 |
| Mar-19 | 1.91% | 3.00% | 1.09% | 394,528,143 | 1,075,089 |
| Jun-19 | 1.91% | 3.00% | 1.09% | 398,771,087 | 1,086,651 |
| Sep-19 | 1.91% | 3.00% | 1.09% | 403,014,030 | 1,098,213 |
| Dec-19 | 1.91% | 3.00% | 1.09% | 407,256,973 | 1,109,775 |
| Mar-20 | 1.91% | 3.00% | 1.09% | 409,737,497 | 1,116,535 |
| Jun-20 | 1.91% | 3.00% | 1.09% | 412,218,021 | 1,123,294 |
| Sep-20 | 1.91% | 3.00% | 1.09% | 375,000,000 | 1,021,875 |
| Dec-20 | 1.91% | 3.00% | 1.09% | 417,179,069 | 1,136,813 |
| Mar-21 | 1.91% | 3.00% | 1.09% | 412,813,546 | 1,124,917 |
| Jun-21 | 1.91% | 3.00% | 1.09% | 408,448,024 | 1,113,021 |
| Sep-21 | 1.91% | 3.00% | 1.09% | 404,082,501 | 1,101,125 |
| Dec-21 | 1.91% | 3.00% | 1.09% | 399,716,978 | 1,089,229 |
| Mar-22 | 1.91% | 3.00% | 1.09% | 399,787,734 | 1,089,422 |
| Jun-22 | 1.91% | 3.00% | 1.09% | 399,858,489 | 1,089,614 |
| Sep-22 | 1.91% | 3.00% | 1.09% | 399,929,245 | 1,089,807 |
| Dec-22 | 1.91% | 3.00% | 1.09% | 400,000,000 | 1,090,000 |

Total:    $24,802,852

*1.91% crediting rate based on 2023 rate and estimated based on publicly available information regarding 10-year return rate of 1.99% and 5-year return rate of 1.56%

* Quarterly SVF assets estimated based on Form 5500 year end assets in the fund

### VOYA Cedars-Sinai SVF Returns Net of Spread v. TIAA GA Investable Benchmark

| Period Start | Voya Cedar-Sinai Net Crediting Rate | TIAA GA Investable Crediting Rate | Excess Spread Fees | SV Assets ($) | Excess Spread Fees by Period ($) |
|---|---|---|---|---|---|
| Jun-17 | 1.91% | 4.80% | 2.89% | 370,504,867 | 2,676,898 |
| Sep-17 | 1.91% | 4.80% | 2.89% | 373,651,937 | 2,699,635 |
| Dec-17 | 1.91% | 4.80% | 2.89% | 375,901,091 | 2,715,885 |
| Mar-18 | 1.91% | 4.80% | 2.89% | 379,497,118 | 2,741,867 |
| Jun-18 | 1.91% | 4.80% | 2.89% | 383,093,146 | 2,767,848 |
| Sep-18 | 1.91% | 4.80% | 2.89% | 386,689,173 | 2,793,829 |
| Dec-18 | 1.91% | 4.80% | 2.89% | 390,285,200 | 2,819,811 |
| Mar-19 | 1.91% | 4.80% | 2.89% | 394,528,143 | 2,850,466 |
| Jun-19 | 1.91% | 4.80% | 2.89% | 398,771,087 | 2,881,121 |
| Sep-19 | 1.91% | 4.80% | 2.89% | 403,014,030 | 2,911,776 |
| Dec-19 | 1.91% | 4.80% | 2.89% | 407,256,973 | 2,942,432 |
| Mar-20 | 1.91% | 4.25% | 2.34% | 409,737,497 | 2,396,964 |
| Jun-20 | 1.91% | 4.25% | 2.34% | 412,218,021 | 2,411,475 |
| Sep-20 | 1.91% | 4.25% | 2.34% | 375,000,000 | 2,193,750 |
| Dec-20 | 1.91% | 4.25% | 2.34% | 417,179,069 | 2,440,498 |
| Mar-21 | 1.91% | 4.25% | 2.34% | 412,813,546 | 2,414,959 |
| Jun-21 | 1.91% | 4.25% | 2.34% | 408,448,024 | 2,389,421 |
| Sep-21 | 1.91% | 4.25% | 2.34% | 404,082,501 | 2,363,883 |
| Dec-21 | 1.91% | 4.25% | 2.34% | 399,716,978 | 2,338,344 |
| Mar-22 | 1.91% | 4.85% | 2.94% | 399,787,734 | 2,938,440 |
| Jun-22 | 1.91% | 6.10% | 4.19% | 399,858,489 | 4,188,518 |
| Sep-22 | 1.91% | 6.10% | 4.19% | 399,929,245 | 4,189,259 |
| Dec-22 | 1.91% | 6.85% | 4.94% | 400,000,000 | 4,940,000 |

Total:   $66,007,079

*1.91% crediting rate based on 2023 rate and estimated based on publicly available information regarding 10-year return rate of 1.99% and 5-year return rate of 1.56%

* Quarterly SVF assets estimated based on Form 5500 year end assets in the fund

## VOYA Cedars-Sinai SVF Returns Net of Spread v.
## v. MassMutual Investable Benchmark
## MassMutual Diversified SAGIC II

| Period Start | Voya Cedar-Sinai Net Crediting Rate | Mass Mutual Investable Benchmark Net Crediting Rate | Excess Spread Fees | SV Assets ($) | Excess Spread Fees by Period ($) |
|---|---|---|---|---|---|
| Jun-17 | 1.91% | 4.02% | 2.11% | 370,504,867 | 1,954,413 |
| Sep-17 | 1.91% | 3.96% | 2.05% | 373,651,937 | 1,914,966 |
| Dec-17 | 1.91% | 3.97% | 2.06% | 375,901,091 | 1,935,891 |
| Mar-18 | 1.91% | 4.22% | 2.31% | 379,497,118 | 2,191,596 |
| Jun-18 | 1.91% | 4.64% | 2.73% | 383,093,146 | 2,614,611 |
| Sep-18 | 1.91% | 4.68% | 2.77% | 386,689,173 | 2,677,823 |
| Dec-18 | 1.91% | 4.66% | 2.75% | 390,285,200 | 2,683,211 |
| Mar-19 | 1.91% | 4.66% | 2.75% | 394,528,143 | 2,712,381 |
| Jun-19 | 1.91% | 4.47% | 2.56% | 398,771,087 | 2,552,135 |
| Sep-19 | 1.91% | 4.41% | 2.50% | 403,014,030 | 2,518,838 |
| Dec-19 | 1.91% | 4.55% | 2.64% | 407,256,973 | 2,687,896 |
| Mar-20 | 1.91% | 4.03% | 2.12% | 409,737,497 | 2,171,609 |
| Jun-20 | 1.91% | 4.03% | 2.12% | 412,218,021 | 2,184,756 |
| Sep-20 | 1.91% | 4.03% | 2.12% | 375,000,000 | 1,987,500 |
| Dec-20 | 1.91% | 4.03% | 2.12% | 417,179,069 | 2,211,049 |
| Mar-21 | 1.91% | 4.03% | 2.12% | 412,813,546 | 2,187,912 |
| Jun-21 | 1.91% | 4.03% | 2.12% | 408,448,024 | 2,164,775 |
| Sep-21 | 1.91% | 4.03% | 2.12% | 404,082,501 | 2,141,637 |
| Dec-21 | 1.91% | 4.03% | 2.12% | 399,716,978 | 2,118,500 |
| Mar-22 | 1.91% | 4.03% | 2.12% | 399,787,734 | 2,118,875 |
| Jun-22 | 1.91% | 4.03% | 2.12% | 399,858,489 | 2,119,250 |
| Sep-22 | 1.91% | 4.03% | 2.12% | 399,929,245 | 2,119,625 |
| Dec-22 | 1.91% | 4.03% | 2.12% | 400,000,000 | 2,120,000 |

Total:    $52,089,246

*1.91% crediting rate based on 2023 rate and estimated based on publicly available information regarding 10-year return rate of 1.99% and 5-year return rate of 1.56%

* Quarterly SVF assets estimated based on Form 5500 year end assets in the fund

*MassMutual crediting rates obtained through database for dates prior to 2020 and from public fund from 2020 onwards.

-33-

128.    Other plans with stable value assets of this size have bid out their stable value funds and obtained better products. Upon information and belief, Defendants did not make a regular practice of submitting requests for proposal for the stable value fund.  Thus, Defendants were not able to take advantage of better rates.  As a result, participants sustained substantial losses during the proposed class period.

### 3.    Failure to Diversify

129.    The funds invested in the VOYA SVF were also not adequately diversified. The risk and return characteristic of the fund depended entirely on the creditworthiness and rates declared by a single entity, VOYA.

130.    ERISA § 1104(a)(1)(C) provides that a fiduciary shall discharge his duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

131.    The VOYA SVF is not diversified. The VOYA SVF is a contract, a piece of paper, subject to the single entity credit risk of VOYA, as the issuer of the contract. The return of the investment depends on crediting rates set at the discretion of a single provider, VOYA. The crediting rate, set by VOYA alone, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest.

132.    In recent years, large 401(k) and 403(b) plans fled fixed annuity products backed by the general account of a single insurance company due to concerns about single entity credit and liquidity risk.  Following the high-profile default failures of stable value fund issuers in 1992 and 1993 by Executive and Confederation Life, the Federal Reserve expressed concerns about the high risk of the insurance company general account products and the flimsy nature of the state guarantees backing the insurance contracts. The industry immediately responded by offering more separate account contracts, which put creditors in line ahead of general account contracts but still resulted in 100% single entity credit and liquidity exposure. Synthetic value was created in 1995 and by 1999, most of the largest plans were in a synthetic based stable

value fund. Synthetic Stable value continued to gain market share over the next 20 years going into smaller and smaller plans.

133.  VOYA indicates on its website that its separate account stable product is generally guaranteed to preserve principal based on the claims-paying ability of Voya Retirement Insurance and Annuity Company.

134.  If Defendants were going to continue to offer a stable value fund, the most prudent choice would be for Defendants to move to a low-cost lower risk synthetic stable value fund structure.  Further, Defendants should have specifically negotiated in the contract that VOYA was a fiduciary and that it could exit at no costs if VOYA was downgraded for any reason.  The single entity annuity contract constrained liquidity and the ability to replace it without incurring exit charges.

135.  Defendants breached their fiduciary duty by offering the unnecessarily risky VOYA SVF product and by offering a share class that did not maximize Plan Participants' returns.

## CLASS ACTION ALLEGATIONS

136.  Plaintiff brings this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows:

137.  All participants in or beneficiaries of the CEDARS-SINAI 403(B) PLAN from six years prior to the filing of the complaint in this matter through the date of judgment (the "Class Period").

138.  The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The Plan has approximately 3,000 participants with account balances.

139.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual class members, including, *inter alia*:

(a)  whether Defendants are fiduciaries of the Plan;

(b) whether Defendants breached their fiduciary duty of prudence with respect to the Plan;

(c)  whether Defendants had a duty to monitor other fiduciaries of the Plan;

(d)  whether Defendants breached their duty to monitor other fiduciaries of the Plan; and

(e)  the extent of damage sustained by Class members and the appropriate measure of damages.

140.   Plaintiff's claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

141.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

142.   Plaintiff has no interests that conflict with those of the Class. Defendant does not have any unique defenses against Plaintiff that would interfere with their representation of the Class.

143.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

## FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty of Prudence
### (Against All Defendants)

144.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

145.   Defendants were fiduciaries of the Plan under ERISA §§ 3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) and under common law trust law because they were either designated in the Plan documents as the Plan Administrator, a named fiduciary under the Plan, performed discretionary Plan-related fiduciary functions, including the selection and monitoring of investment options for the Plan, and/or the negotiation over services and fees for the Plan, and/or were responsible for the administration and operation of the Plan.

146.   As a fiduciary of the Plan, Defendants were required, pursuant to ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1) and common law, to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

147.   Common law and ERISA's duty of prudence required Defendant to give appropriate consideration to those facts and circumstances that, given the scope of its fiduciary investment duties, it knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

148.   As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached its fiduciary duties in various ways. Defendants failed to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Defendants failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. A prudent fiduciary in possession of this information would have removed these investment options, replaced them with more

prudent and lower cost alternatives, and/or used the size, leverage and bargaining power of the Plan to secure significantly reduced fees for comparable investment strategies.

149.    In addition, Defendants failed to monitor or control excessive compensation paid for recordkeeping and administrative services which resulted from the unnecessary payment of recordkeeping and other services as a percentage of assets.

150.    In addition, Defendants failed to monitor or control excessive compensation paid for shareholder or financial advising services which resulted from the unnecessary payment of those services as a percentage of assets.

151.    Defendants knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

152.    As a direct and proximate result of these breaches, the Plan, Plaintiff and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced. Additionally and regardless of the losses incurred by Plaintiff or any member of the Class, pursuant to ERISA §§ 502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§ 1132(a)(2) and (a)(3), and 1109(a), and common law trusts, Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of Defendant's breaches of the duties of loyalty and prudence, and such other appropriate equitable relief as the Court deems proper.

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers
### (Against All Defendants)

153.  Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

154.  Defendants had overall oversight responsibility for the Plan and control over the Plan's investment options through its authority to limit or remove the other Plan fiduciaries.

155.  A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA and common law trusts.

156.  Defendants also had a duty to ensure that other Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

157.  Defendants breached their fiduciary monitoring duties by, among other things:

(a) failing to monitor and evaluate the performance of other Plan fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Plan fiduciaries' election to continue to pay fees that were significantly higher than what the Plan could have paid for substantially identical investment products readily available elsewhere, as detailed herein;
(b) failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the excessive costs being incurred in the Plan to the substantial detriment of the Plan and the Plan's participants' retirement savings, including Plaintiff and members of the Class; and

(c) failing to remove fiduciaries whose performance was inadequate, as they continued to maintain expensive and poorly performing investments in the Plan, all to the detriment of the Plan and Plan participants' retirement savings; (d) failing to institute competitive bidding for covered service providers.

158.    As a direct and proximate result of these breaches of the duty to monitor the Plan, Plaintiff and members of the Class suffered millions of dollars of losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

159.    Pursuant to ERISA § 502(a)(2) and (a)(3), and ERISA § 409(a), 29 U.S.C. § 1132(a)(2) and (a)(3), and 29 U.S.C. § 1109(a), Defendant is liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by its breach of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

## PRAYER FOR RELIEF

Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests the Court:

- Certify the Class, appoint Plaintiff as class representative, and appoint Christina Humphrey Law, P.C. and Bradley/Grombacher, LLP as Class Counsel;

- Find and declare that Defendants have breached their fiduciary duties as described above;

- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of their fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of their fiduciary duties;

- Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under § 1109(a);
- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;
- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;
- Order equitable restitution against Defendants;
- Monetary Damages;
- Award to Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;
- Order the payment of interest to the extent it is allowed by law; and
- Grant other equitable or remedial relief as the Court deems appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE BY LAW.**

Dated: June 13, 2023               **CHRISTINA HUMPHREY LAW, P.C.**
                                   **BRADLEY/GROMBACHER, LLP**


                            By: _____
                                 CHRISTINA A. HUMPHREY
                                 ROBERT N. FISHER
                                 MARCUS J. BRADLEY
                                 KILEY GROMBACHER

                                 *Attorneys for Plaintiffs*

-41-